## No. 10,161.

### C. C. ANTOINE vs. D. D. SMITH, ET ALS.

Where the cause of the contract sought to be enforced is unlawful and opposed to good morals and public policy there is no right of action in the courts, for either party *suing through it*, to inforce it.

But, after the reprobated transaction has become an accomplished fact, neither party can legally interpose such illegality or turfeitude as a defense.

An instrument cannot be rejected and disregarded as not evidencing a compromise because it does not contain the formal words "for preventing or putting an end to a law suit." Under our system of practice nothing is sacramental, as a matter of form, unless made so by statute.

The disproportion of the amount received as compared with that of the amount demanded, is no cause for the rescission of the transaction otherwise valid, and same cannot be explained or disclosed by parol evidence.

Error, fraud or the like must be formally averred against it and proved, to avoid it.

APPEAL from the Civil District Court for the Parish of Orleans. *Voorhies*, J.

---

*Rouse & Grant* and *T. J. Semmes* for Plaintiff and Appellant:

A compromise may be set aside under the civil law, unless founded on a doubtful right. 28 Laurent, Nos. 324-5; 9 Marcadé, Nos. 471, 568-9; 18 Duranton, Nos. 395-8; 3 Aubry & Rau, p. 476 (F.); 3 Mourlon, N. 1170; Domat, vol. 3, p. 10. No. 1.

Antoine vs. Smith et als.

The rule is the same as common law.  Stapleton vs. Stapleton, 1 Atkyns 10 ; Broderick vs. Broderick, 1 P. Wm. 241 ; Lucy's Case, De G. McN, & G. 364 ; Ex-parte Banner, 17 Ch. Div. 488 ; Wheeler vs, Smith, 9 H. 82.

An agent is not permitted to deal with the principal unless there be the utmost good faith on his part, a full disclosure of all the facts, and the absence of all undue influence and advantage.  1 Story's Eq. Jur., Sects. 217, 246, 315, 316, 323 ; Brook vs. Martin, 2 Wallace, 70.

An agent is a fiduciary and subject to the same rules as a trustee in dealing with his principal.  1 Perry on Trusts, Sec. 206.

*Uberrima fides.*  The utmost good faith is exacted from him in all his transactions touching the interests of his principal.  Meeker vs. York, 13 Ann., 18 ; Nolan vs. Shaw, 6 Ann. 40.

A contract by which a person exacts an advantage from another for doing what he is already bound to do, by the law or by a subsisting agreement, is immoral, against justice and void.  1 Pothier, 3 Am. Ed., p. 123.

At the common law, such a contract is void for want of consideration.  Pollock on Contracts, p. 162.

A sale for a price out of all proportion to the value of the thing sold is void.  C. C. 2464.

Where the inadequacy of price is so marked as to shock the conscience of a man of common sense, it amounts to fraud, in which case the inadequacy itself, *ex evidentia rerum*, proves fraud.  Osgood vs. Franklin, 2 Johns., Ch. 1 ; Eyros vs. Potter, 15 H. 42.

A release of the owner's title to property for consideration, is subject to the same rule as the contract of sale, it being in effect a sale.

Third persons can claim the benefit of stipulations in contracts only where such stipulations are clear, plain and unequivocal.  Mitchell vs. Cooley, 5 R. 240.

## *Leonard, Marks & Bruen* for Defendant and Appellee:

1.  An act under private signature, when signature is admitted, has against the parties the force and effect of an authentic act.  C. C. 2242.  It is full proof of the agreement contained in it.  C. C. 2236.

2.  The instrument of date of Sept. 4th, 1884, annexed to answer, is an agreement—a commutative contract.  C. C. 1761-5-8.

3.  It is conclusive against plaintiff's demand, unless fraud, error or violence be shown, and the burden of proof is on plaintiff.  C. C. 1819, 2232.

4.  A transaction or compromise is an agreement between two or more persons who, for preventing or putting an end to a law suit, adjust their differences by mutual consent in the manner in which they agree on and which every one of them prefers to the hope of gaining balanced by the danger of losing.  C. C. 3071.  It must be reduced to writing, but is not otherwise subject to any form.  C. C. 3071.  Whenever it appears from the agreement itself, or from evidence *dehors* the written instrument, that it was an adjustment of differences by mutual consent for the purpose of preventing or putting an end to a lawsuit which each party prefers to the hope of gaining balanced by the danger of losing, such agreement is a compromise.  Sirey, Art. 2044, No. 5 ; Stewart & Co. vs. Haas et al., 23 Ann. 783.

5.  Transactions have between the parties a force equal to the authority of the thing adjudged  They cannot be attacked on account of any error in law or any lesion.  C. C. 3078.

Obligations are extinguished by remission.  C. C. 2130.  The release of a debt liberates the debtor *pleno jure.*  Pothier, 570.  The *pactum remissorium—pactum de non petendo* is binding ; all that is required to give it validity is a simple convention or agreement.

It always avails the debtor as an exception to the action instituted by the creditor. Mouton vs. Noble, 1 Ann. 194. It cannot be revoked by the creditor. C. C. 2201.

7. It appears from plaintiff's testimony that the cause, the motive which induced him to transfor certain lottery stock, was false, unlawful, contrary to moral conduct and to public order. The contract by which he transferred the stock was therefore unlawful. *Ex turpi causa non oritur actio,* C. C. 1779, 1893, 1895-11. The Court will not lend its aid to settle disputes relative to such contracts, will notice their illegality ex-officio, and allow it to be suggested without any plea and at any stage of the proceedings. 12 Ann. 219; 13 Ann. 209; 3 N. S 46; 17 La. 132; 2 R. 271; 1 Ann. 176; 12 Ann. 166; 5 R. 106; 19 La. 409; 9 R. 486, 491; 2 Ann. 60, 66; 6 Ann. 317, 320.

8. The evidence and pleadings considered as a whole disclose no cause of action.

.   Stale demands are entitled to no favor, must be supported by peculiarly strong and convincing evidence and established with more than reasonable certainty. 7 Ann. 555, 562; 14 Ann. 317; 10 Ann. 279; 35 Ann. 1006; 9 Ann. 234; 2 La. 481; 6 La. 31, 674; Etting vs. Marx, Ex'r., 4 Federal Reporter, 681.

10. Admissions by one deceased proved by witnesses who cannot be contradicted, much less convicted of perjury, is the weakest kind of evidence, scarcely entitled to any belief. 7 R. 112; 9 La. 562; 11 La. 139; 8 Ann. 307, 278; 14 Ann. 274; 37 Ann. 873.

11. The testimony of witnesses will have no weight if intrinsically improbable. 29 Ann. 764; 37 Ann. 95; 35 Ann. 1006; 9 Cranch, 71; 18 Wall. 91; 12 Peters, 262.

---

The opinion of the Court was delivered by

WATKINS, J.   This suit is for the recovery of two hundred shares of the capital stock of the Louisiana State Lottery Company from the defendants.

The claim of the plaintiff is that, on the 26th of October, 1874, he transferred, on the books of the company, said shares of stock to D. D. Smith, without consideration; and that said transfer was made upon the friendly advice of one George L. Smith, who suggested to him that, being engaged in politics, and necessarily absent from the city a large portion of the time, he would be unable to manage the stock to an advantage, and that it would be better that it should be placed under his control. He further advised him that, for his own convenience, it should be placed in the name of D. D. Smith, a trustworthy and responsible person; and that it was so done.

He represents that George L. Smith executed and delivered to him a receipt for the stock, at the time, in which he obliged himself to return it on call; all of which was to the knowledge of D. D. Smith, who undertook to administer same accordingly.

That George L. Smith died on the 9th of July, 1884, without having caused said stock to be returned. That he demanded the stock and its dividends of D. D. Smith, whereupon he paid $2500 on account of the *dividends, but refused to surrender the stock.*

The answer is that G. L. Smith assigned to D. D. Smith 425 shares

of the stock of said company, which he then owned, and informed him of the fact; that thereupon D. D. Smith went to the office of the company and procured the certificates therefor; and that he was not informed, and did not know how, when or from whom George L. Smith procured the same.

He avers that he was not advised and did not know that Antoine had any interest in the stock; and that he did not undertake to administer it for him.

That soon after the death of George L. Smith, Antoine called to see him, and claimed of him (D. D. Smith) *some* of the shares of stock, alleging himself the owner thereof, and threatened suit for the same; and though he did not believe he had any interest in the stock—in order to avoid a lawsuit and to buy his peace—he gave him $2600, in consideration whereof Antoine relinquished all claim to any interest in the stock standing in his (D. D. Smith's) name; and also relinquished all claims of any kind against the estate of George L. Smith

The defendants are D. D. Smith and the heirs of G. L. Smith, who have accepted his succession unconditionally, and have been placed in possession thereof.

On the trial the defendants plead the agreement referred to in their respective answers, " as a transaction, and compromise, which had and has, as against said Antoine, and the claims and demands by him asserted herein, the force and effect of *res judicata* ;" and they plead it as a peremptory exception, and as a bar to plaintiff's action.

This plea having been overruled they plead same agreement as a release, executed by the plaintiff, which he could not revoke at will, and urged it as a bar to the demands of Antoine.

On these issues the parties went to trial, and from a judgment in favor of the defendants, the plaintiff appealed.

## I.

It is well that the testimony of the plaintiff and that of some of his witnesses should be examined and analyzed, in order that a fair understanding may be had of the incipiency of this *singular* transaction, and that we may be the better enabled to judge of the rightfulness of plaintiff's claim. This is deemed necessary for the especial reason that one of the principal actors died several years before suit was brought, and the filing of it occurred nearly fifteen years after the alleged transfer of the stock.

Indeed, defendant's first exception was that plaintiffs' demand was stale and prescribed by five and ten years.

Antoine vs. Smith et als.

The following is a synopsis of the statement of Antoine, as a witness in his own behalf, in so far as it bears on that part of his case, viz:

That he and George L. Smith were close, confidential friends from the time they entered politics in 1868 to the time of the latter's death in 1884.

That there were many and large money transactions between them. For instance, Smith being tax collector, speculated in plaintiff salary warrants, and realized sometimes as much as $3000 or $4000 in profits for his (plaintiff's) account.

That he purchased the 200 shares of lottery stock in controversy, on the 31st of March, 1873, from Charles T. Howard, at 60 cents on the dollar—i. e., $12,000. That about eighteen months afterwards Smith came to him and said that they—Antoine and himself—had better transfer this stock.

Using his own words, he says:

" He said that both of us was engaged in politics—he was then running for Congressman, or member of the Legislature. We were in politics, both of us. I don't recollect exactly, but his remarks were, 'We are both engaged in politics, and that it would not do to have the stock in our name. He said that more especially myself, as I was Lieutenant Governor, and President of the Senate; that questions in regard to the charter of the Lottery Company might come up, and that, in case of a tie vote, I would naturally have to have to vote on it; and, probably, my vote might be challenged.' And he suggested that we should transfer our stock in the name of his cousin, Dexter. *  *  *  "He said Dexter—meaning David Dexter Smith—is as honest as the days are long. He says, 'I will manage the stock for you, and invest (the dividends) in stocks, bonds and other securities; and when we are out of politics, we will start a savings bank; you shall be president, and I a member of the board of directors.' "

He says that the transfer was made at the lottery office, when no one was present, other than George L. Smith. That the purchase of this stock was suggested to him by Mr. Kelso. Smith transferred, at the same time, his 225 shares to D. D. Smith. But the latter was not present. He says Smith gave him a receipt for his stock, but he kept no account with Smith.

To use his own words, he says:

" Well, there were usually no accounts kept between us of our business. Mr. Smith he always put all our business on the high ground of mutual confidence. That is the way he, more or less, dealt with me."

He says that, from time to time, he obtained from him *what money he wanted*.

Quoting:

Q.  "Do you know how much you got?"

A.  "Well, I don't know exactly.  I can approximate.  I suppose I must have got altogether from him, after the stock was transferred—I must have got about $5300, or $5400," etc.

This gentleman, Mr. Antoine, was a delegate from Caddo parish to the Constitutional Convention of 1868, and afterwards he represented that parish in the State Senate until 1872, when he was elected Lieutenant Governor.  He held that office until 1876, a period of time embracing all of these transactions.

As further illustrated of the history of that epoch, and particularly of the part the plaintiff took therein—and which has a significant bearing on this controversy—it is well to invite attention to the various financial adventures on which he entered in the *interim*.

When he first " went into politics " he was the proprietor of a barber shop in the city of Shreveport.

A few years afterwards he engaged in the cotton factorage business in this city, in partnership with P. B. S. Pinchback; acquired an interest in a newspaper establishment; had a grocery store, and purchased and operated a small plantation in Caddo parish.  He also purchased some city lots in Shreveport, and a $13,000 residence in this city.  This in addition to the $12,000 he paid for the lottery stock.

We cannot refrain from expressing some surprise at the auspicious good fortune that seemed to attend his efforts, whereby his hitherto slender income and limited means had yielded such a comfortable little fortune within so few years !

Money matters appeared to have been so easy with him that he could loan a friend a thousand dollars, payable on call.

He says :

" I loaned him (Dr. Pemberton) $1000, just on his word, and he returned it."

Mr. George Z. Kelso, one of plaintiff's witnesses, gives his version of the transaction in reference to this stock.  He says :

" In January, 1873, I had 200 shares of lottery stock put aside for me, and when the time expired for me to take it up, I wasn't able to take it up, and I advised Mr. Antoine to take it.  *  *  I went with Mr. Antoine to the party and told the party Mr. Antoine would take the shares in my place.

" Question.　Who was the party ?

" Answer.　Mr. Charley Howard.

" Q.　Did you see the money paid ?

" A.　I saw Mr. Antoine give him a roll of bills; he counted it and said it was correct, and gave him the certificate."

On cross-examination the following was elicited, viz :

" Q.　You say that you had 200 shares of Louisiana Lottery stock put aside for you ?

" A.　Yes, sir.

" Q.　Who put it aside for you ?

" A.　Mr. Howard.

" Q.　The president of the Louisiana Lottery Company ?

" A.　Yes, sir.　I had bought some stock previous to that.　A party came to me in 1869 and told me that he could get me 300 shares at 15 cents.　He went out and only returned with 50 shares; but I paid him 20 cents.　I lost my stock with a broker—a friend of mine—and Mr. Howard, as a friend of mine, told me he *would put aside* 200 shares for me, at a certain figure.

" Q.　That is the stock you referred to ?

" A.　Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

" Q.　Mr. Howard then suggested that he would put aside 200 shares for you ?

" A.　He asked me if I was tired of the stock—that it was good stock.　Mr. Charley wasn't friendly to the party who had my stock, and I went and seen the party.　I saw Mr. Howard afterwards, and I told him *I was friendly to his institution,* and I told him I would take 200 shares at a certain figure, provided he would wait on me.　He said he would keep it for me for 60 days.　At that time I failed to take it up, and I seen Mr. Antoine and gave him the benefit of it."

This is the history of this stock, as detailed in the evidence of the plaintiff, Antoine, and his principal witness, Kelso—the former Lieutenant Governor at the time, and the latter State Senator.

On the faith of these declarations as to the source and origin of the plaintiff's title and the character and avowed object of his dealings with George L. Smith, and through which he traces his title, defendant's counsel insist that it is manifestly a contract that is tainted, and reprobated in law as in good morals, and for the enforcement of which he has no right or cause of action against the defendant.

He further insists that it is the duty of courts of justice to vindicate and maintain the sanctity of their proceedings before they proceed to

the consideration of the merits of a case, and that, in the instant case, the *cause* of the contract and the *motive* of its transfer are in themselves intrinsically illegal, false and unlawful, and opposed to good morals and public policy.

That such contracts cannot be enforced has been held in very many opinions of this Court and its predecessors is evidenced by the following cases : 5 Ann. 18, Denton vs. Erwin; 3 N. S. 46, Mulholland vs. Voorhies; 17 La. 132, Gerooby vs. Caneby; 2 R. 271, Davis vs. Caldwell; 1 Ann. 176, Davis vs. Holbrook; 12 Ann. 166, State vs. Lazarre; 5 R. 106, Slidell vs. Pritchard ; 9 R. 486, M. Ins. Co. vs. New Orleans ; 2 Ann. 60, Denton vs. Wilcox ; 6 Ann. 317, Denton vs. Erwin ; 38 Ann. 634, Gloin vs. Taylor.

But, however much we may reprobate such scandalous transactions ; however much we may feel constrained, for decency's sake, to summarily eject the plaintiff from the portals of the temple of justice, it is our deliberate opinion that it cannot be done in the present attitude of this affair.

Fortunately, the *regime* in which such abuses were possible, has long since terminated and passed into history, and the people who were instrumental in bringing it about have. passed from the stage of action. George L. Smith is dead, and the plaintiff has ceased to be Lieutenant Governor; D. D. Smith is no longer the representative of George L. Smith, but he is representing his heirs. There stands on the books of the Lottery Company 290 shares of its capital stock, to which *one* of the parties is entitled, irrespective of the fraud and peculation that may have characterized the transactions, through which its issuance and transfer were procured.

We understand this to be the jurisprudence established on that subject by the Supreme Court. In Brooks vs. Martin, 2 Wallace, 80, that great Court employs this striking language, viz :

" There was then, in the hands of the defendant, lands, money, notes and mortgages, the results of the partnership business, the original capital for which plaintiff had advanced.

" It is to have an account of these funds and a division of these proceeds that this bill is filed. Does it lie in the mouth of the partner who has, by fraudulent means, obtained possession and control of all these funds, to refuse to do equity to his other partners, because of the wrong *originally* done, or intended, to the soldier ? * * *

" The title to the land is not rendered void by the statute. It interposes no obstacle to the collection of the notes and mortgages.

The transactions which were illegal have become *accomplished facts*' and cannot be affected by any action of the Court in this case."

This opinion was most carefully and deliberately expressed after a thorough review of the best American and English cases on the subject, and the doctrine meets our unqualified approval. Our decree must rest on different grounds.

II.

The plea of *res judicata* urged by the defendant's counsel rests on the following instrument:

"NEW ORLEANS, September 4th, 1884.

"In consideration for a note from David Dexter Smith, dated September 4th, 1884, for twenty-four hundred dollars ($2400), the surrender of a note which the said Smith holds against me for one hundred dollars, dated September 13th, 1876, and one hundred dollars in cash, I hereby surrender all claims I have to any Louisiana State Lottery stock on the books of said company in the name of David Dexter Smith. I further agree to relinquish all claims and considerations in every form against the estate of the late George L. Smith, deceased, also to pay any balance, if called for, that the estate of said Smith might be liable for by said George L. Smith's signature to my bond as treasurer of the School Board for the city of Shreveport, parish of Caddo, State of Louisiana. This being a receipt in full for all demands in any form against the estate of the late George L. Smith, deceased, also any and all claims in any form against David Dexter Smith.                              C. C. ANTOINE."

The signature is admitted to be that of the plaintiff. It is not disavowed in the plaintiff's pleadings, notwithstanding his counsel filed *one* supplemental petition subsequent to the filing of defendants' answer, to which said agreement was annexed, and of which it was made a part.

The provisions of the code are that " a transaction, or compromise, is an agreement between two or more persons who, for preventing or putting an end to a law suit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing. This contract *must* be reduced to writing." R. C. C. 3071.

Our learned brother of the district court declined to give effect *as a compromise* to the agreement in question, because it did not contain the phrase, " for preventing or putting an end to a law suit."

In *Calhoun* vs. *Lane*, 39 Ann. 596, we gave effect to an itstrument as a compromise, which did not contain these formal words. We can see

no good reason why their use should be deemed *essential*. Under our liberal system of practice, nothing is sacramental as a matter of form, unless expressly so declared by statute. The instrument does not contain the phrase, " and which every one prefers to the hope of gaining, balanced by the danger of losing," which would seem to be equally important.

In our view, the only *essential*, as a matter of form, which the article duoted requires is that " the contract *must* be reduced to writing."

Without recapitulating the terms, provisions and conditions of the instrument, we hold it to be a transaction, or compromise, in the sense of the code, and was evidently intended for the purpose of *preventing* law suit.

A transaction has " a force equal to the authority of things adjudged." R. C. C. 3078.

"A thing adjudged is said of that which has been decided by a final judgment, from which there can be no appeal, either because the appeal did not lie, or because the time fixed for appealing is elapsed, or because it has been affirmed on appeal." R. C. C. 3556, No. 31.

Under this view of the case we are dispensed from the consideration of a mass of testimony that is, in the main, conflicting and quite unsatisfactory, and the recital of which could only serve to fortify and strengthen the conclusion at which we have arrived.

### III.

While the only plea plaintiff, as a witness in his own behalf, *could* set up was that he did not read the instrument when it was presented for his signature, and that he signed it thinking it a receipt, his learned counsel argue against the effect of it *as* a compromise, because—

1. Of the disproportion of the amount Antoine received and the value of the stock.

2. Because advantage was taken of his necessitous circumstances.

The law provides that a compromise cannot " be attacked on account of error in law, or any lesion." R. C. C. 3078.

In *Davis* vs. *Lee,* 20 Ann. 248, the Court said that " in transactions, as they are defined in the code, and in the Roman law, there is, from the nature of such contracts, something aleatory."

Pothier, in treating on this subject, says :

" There are certain agreements in which persons of full age are *not* entitled to restitution, be the injury *ever so considerable.* Such are compromises according to the edict of Francis II. These are agreements respecting pretensions upon which there are impending, or

*expec'ed,* litigations.  *    *    *    *    By the very nature of such agree-
ments, the intention of the parties is the avoidance of litigation, even
at the expense of what belongs to them." 1 Pothier Ob., p. 121 (36).

In *Long* vs. *Robinson*, 5 Ann. 627, the Court said :

" The plaintiff seems to rely to establish both (of his demands) by
the *large amount of his claim compared with the small sum of* $3000, *for
which they were compromised.* But the code expressly provides, that a
compromise cannot be annulled on account of any lesion—Art. 3045 ;
because it is an agreement to put an end to a law suit, and which the
parties prefer to the hope of gaining, balanced by the danger of
losing.   Code 3038.

" The plaintiff is, therefore, not only unfounded in the opinion, that
the sacrifice he made in the compromise is cause for its rescission, but
the district court properly refused to admit testimony of the value of
the property and claims compromised by him."

There is no proof in the record that any advantage was sought or
obtained of Antoine's embarrassed financial situation.

He it was who sought an interview with D. D. Smith, *at once* he
ascertained that George L. Smith was dead ; and, without ceremony,
threatened him with a law suit because he declined to yield to his
demands.   Immediately afterwards he sent a lawyer to him.   During
the ten days' delay allowed for a conference with the heirs, who
resided in a distant State, he *voluntarily* accepted $2600 in *settlement* of
his claims, whatever they were.   His financial situation was not dis-
cussed.   It did not constitute a factor in the settlement.   No proof
shows that D. D. Smith, or the heirs, knew anything of his
embarrassment financially.

The fact that Antoine did forbear, during all these years, to prefer
any claim, judicially, against his alleged confidential friend, while
living ; his *immediate* action after his death ; the fact that when the
$2600 was procured he remained in contented silence for near three
years before this suit was filed, and then filed it without any admoni-
tion whatever to D. D. Smith, or the heirs ; and the fact that he does
mainly rely upon his *own* testimony to evade the effect of his written
relinquishment, place him in a doubtful and unenviable light before
this Court.

IV.

The further argument is made that, *as* a compromise, the instrument
so-called cannot be given effect, because the transaction alleged to
have been compromised possessed *no element of doubt.*

To this a sufficient reply is made by the judgment pronounced by

our learned and conscientious brother of the lower court, who *saw* the witnesses and *heard* them testify. And, notwithstanding the lips of George L. Smith were sealed in death, and the plaintiff produced a number of witnesses by whose evidence, to bolster up his cause, he manifestly disbelieved their story, and rejected his demands.

While we do not rest our decree upon the same grounds as did the judge *a quo*, it is quite likely that if we should, it would be the same·

Judgment affirmed.