PROVOSTY, J.
The plaintiff, Webster, while a resident of Shreveport; organized a corporation for constructing an oil refinery in that city. He was manager of the company when he and the two defendants, S. J. Harman and J. M. Ledbetter, entered into the following contract:
“State of Louisiana, Parish of Orleans.
“Before me, the undersigned authority, and in the appearance of attesting witnesses, personally came and appeared C. D. Webster, who declared to me:
“That, whereas, on September 1, 1911, he made a written proposal to S. J. Harman and J. M. Ledbetter of Shreveport, Louisiana, rel *1083 ative to the purchase of ninety-four (94) shares of the capital stock of the Webster Refining Company of Louisiana as is more fully shown by the said written proposal, which is as follows, to wit:
“ ‘Shreveport, La., September 1, 1911.
“ ‘Dr. J. M. Ledbetter and Mr. S. J. Harman, Shreveport, La. — Gentlemen: The Webster Refining Company of Louisiana, organized under the laws of Louisiana, with capital stock of twenty-five thousand ($25,000.00) dollars, two hundred and fifty (250) shares at one hundred ($100.00) dollars a share fully paid and non-assessable, is now completing an oil refinery in this city, which can refine six hundred (600) barrels a day of gasoline and refined oil.
“ ‘The cost of the refinery up to date has been six thousand eight hundred and ninety-four and 25/100 ($6,894.25) dollars and the total cost will be about eight thousand ($8,000.00) dollars. It is located on six and 94/100 (6<>Vioo) acres of land purchased of the Shreveport Creoting Company for one thousand ($1,000.00) dollars an acre with five years to pay for same at seven (7 per cent) per cent interest.
“ ‘Of the two hundred and fifty (250) shares, two hundred (200) shares have been issued as follows, at one hundred ($100) dollars a share:
Fred Plumb....................................1 share
H. W. Wertzbah..............................25 shares
I. L. Helpman.................................12 shares
J. H. Gillespie................................10 shares
O. L. Horn.....................................6 shares
A. Kuhn........................................5 shares
Mr. Tullos......................................5 shares
R. S. Ayers....................................5 shares
W. H. Whitworth..............................5 shares
O. D. Webster................................125 shares
Total ......(.............................200 shares
“ ‘This stock being given for building the refinery and furnishing certain processes for refining.
“ ‘Of the one hundred and twenty-five (125) shares given me for building the refinery, I have given to the purchaser of the first seventy-four (74) shares of stock one share of my one hundred and twenty-five shares for each share purchased.
“ ‘If you will buy the ninety-four shares held by M. H. Wertzbag, I. L. Helpman and J. H. Gillespie, I will give you in full ownership ten shares of my stock and will deposit four thousand ($4,000.00) dollars o'f stock with such trustee as you name, to be held to guaranty.
“ ‘First. If at any time within two years your stock is not worth what you paid for it, you may sell enough of my four thousand ($4,-000.00) dollars of stock to make you whole.
“ ‘Second. If the amount you invest does not pay fifteen (15 per cent) per cent the first year, you can have enough dividend due on my stock to given you fifteen per cent.
“ ‘I make this proposition not only to get you to make this purchase of stock at this time, but to get you to help as directors in the company.
“ ‘We will sell our oils only to best interest to company and will start our business with assured profit. [Signed] C. D. Webster.’
“And, whereas, the said Harman and Led-better accepted the offer as is set forth in the said written proposal of date September 1, 1911, and purchased and paid for the said ninety-four (94) shares of stock therein referred to:
“Now, therefore, this contract witnesseth that the said C. D. Webster, having transferred ten shares of stock to the said Harman and Led-better as provided in said agreement, does hereby pledge and hypothecate into and in favor of the said Harman and Ledbetter forty (40) shares of the capital stock of the said company to secure his faithful and complete compliance in carrying out of the offer and agreement made by him in said proposal.
“And also came and appeared S. J. Harman and J. M. Ledbetter, who declared to me that they have accepted the proposition as made to them by the said G. D. Webster under date of September 1, 1911, and do now with the said C. D. Webster consent and agree that the shares of stock which are herein pledged to secure the agreement of the said Webster be deposited with Ed Dickerson as trustee.
“And to these presence also came and appeared Ed. Dickerson who hereby acknowledged receipt of forty shares of capital stock of Webster Refining Company of Louisiana, and now obligates and agrees to hold the same and act as trustee hereinabove provided.
“In witness of all of which this agreement is executed in triplicate on this the 13th day of September, 1911. C. D. Webster. S. J. Harman. J. M. Ledbetter. Ed. Dickinson.
“Attest: S. L. Herold. Crea Pugh.
“J. A. Thigpen, Notary P.ublic.”
The control of the company passed, into the hands of the defendants; and they, discovering that plaintiff had mismanaged its affairs, called a meeting of the stockholders for the purpose of displacing him.
*1085 At the time this meeting was held, plaintiff was penniless, and had decided to remove from Shreveport to Oklahoma, and the extent of his expectation ever to realize anything from his connection with the company may be said to have been to be paid an amount of $350, which he claimed was due him for back salary as manager.
Anticipating trouble, if not actual violence, at tbe meeting, he took along with him a lawyer named Keeney to be his spokesman. Mr. Harman testifies that nothing but plaintiff’s age prevented him from striking him. In order that Mr. Keeney’s authority might not be Questioned at the meeting plaintiff hurriedly that night executed the following power of attorney:
“Before me, the undersigned, E. Barnett, notary public in and for the parish of Oaddo, state of Louisiana, personally came and appeared C. B. Webster, of the parish of Oaddo, state of Louisiana, who declared that he does by these presents make, authorize, constitute and appoint A. D. Keeney, of the parish of Oaddo, state of Louisiana, true and lawful attorney in fact, for him and in his name, place and stead to sell, pledge, mortgage, hypothecate or otherwise incumber any and all shares of stock held by said Webster in the Webster Refining Company of Louisiana, and transfer said stock upon the books of the said company; to appear for said Webster at any and all meetings of the stockholders of said company; and to fully represent said Webster in any and all matters and things relative to the affairs of said company, giving and granting Ms said attorney full power and authority to do and perform all and every act and thing requisite and necessary in the premises, as fully to all intents and purposes as said appearers might or could do if he were personally present and with full power of substitution and revocation hereby ratifying and confirming any and all acts done by said agent and attorney by virtue of this authority.”
At the meeting one of the defendants asked plaintiff “what this man Keeney was doing here,” and plaintiff answered that — ■
“Keeney was there as his agent, and , had full power and authority to act for him in conducting the matters of the company.”
Plaintiff left for Oklahoma the next day.
Defendant sought to prove on the trial that the stock of the company was at that time valueless (for the reason, we gather, that the debts exceeded tbe assets); but, on objection of plaintiff, tbe evidence was ruled out: enough crept in, however, to satisfy us that the situation was exactly as thus sought to he proved.
[1] The two defendants found- that they would have to furnish the company the money with which to get back on its feet, and that the taking of this risk would be for the benefit of plaintiff to the extent of his ownership of the stock. They desired therefore to convert the pledge which they held of plaintiff’s 40 shares of stock into a full ownership of it, and, thinking that plaintiff would be willing to' agree to this in satisfaction of a note of his of $100 which Mr. Harman held, they instructed their attorney, Judge Thigpen, to make the proposition to Mr. Kegney, who plaintiff had told them would he his agent in connection with the affairs of the company. Mr. Keeney asked for time in which to consult plaintiff, and shortly thereafter informed Judge Thigpen that he was ready to accept the proposition; and the following instrument was accordingly drawn up:
“Before me personally appeared A. D. Keeney, agent and attorney in fact for O. D. Webster, as per power of attorney annexed, who declared to me that for and in consideration of the return and cancellation of one note executed by the said O. D. Webster for the sum of one hundred ($100.00) dollars, and now held and owned by S. J. Harman and for and in consideration of the written obligation and agreement of S. J. Harman and J. M. Ledbetter to release the said O. D. Webster from any and all obligations under his agreement embodied in a letter written by Mm to J. M. Ledbetter and S. J. Harman under date of September 1, 1911, which was accepted by S. J. Harman and J. M. Ledbetter.
“He does hereby transfer,’ convey, set over, and assign and sell unto the said S. J. Harman and J. M. Ledbetter four thousand ($4,000.00) *1087 dollars of the stock of the capital stock of the Webster Refining Company of Louisiana, which stock is now in the hands of Ed. Diehson, as trustee, under agreement of the 13th day of September, 1911, under which said agreement the said stock was pledged to carry out and secure the agreements of the said Webster as therein contained.
“And the said Keeney, agent, declares that he does hereby authorize and empower the secretary of the Webster Refining Company -of Louisiana, to. make transfer of said stock on the books of the company; and does hereby authorize Ed. Dickson, trustee, under said agreement, to deliver said stock to S. J. Harman and 3. M. Ledbetter.”
Mr. Keeney testifies that he submitted the proposition to plaintiff, and that plaintiff consented to its being accepted. Plaintiff testifies to the contrary. We have to attach greater weight to the testimony of Keeney, since he is entirely disinterested and unimpeached, and more than this, was at the time of entering into this agreement not on good terms with the defendants, whereas plaintiff is the party in interest and is to some extent impeached, and there is the testimony of Judge Thigpen, as to which there can be and is no question, that Keeney asked for time in which to consult plaintiff before consenting to the transaction, and did take time for that purpose, from whidh a strong inference arises that Keeney did consult plaintiff, and that the response was favorable. Keeney would otherwise have been without any motive whatsoever for making the transaction, for he had no personal interest in the matter and was unfriendly to the defendants. And there is no reason why the plaintiff should not at that time have been willing to accept the proposition. He could not, and. did not, pretend not to owe the note in payment of which the stock was transferred, the condition of the company was such that its stock was worthless, plaintiff had been unable to pay an assessment of some 70 per cent heretofore levied by the company on its stock, which assessment the other stockholders had paid, the pledged stock whs no longer in his possession, but in the hands of a trustee to guarantee a result apparently impossible of realization, since the company was practically in a collapsed condition. The fact that it revived and prospered under the stimulus of the new blood, in funds and good management, put into it by defendants, is not to enter at all into the problem; but the situation is to be viewed as it was at that time — no money on hand and no credit, the issued stock nonassessable, and assets not likely to satisfy all debts on forced liquidation, a majority of the stockholders hostile, and plaintiff gone, after shaking from his feet the dust of Shreveport, and leaving word to do the best that could be done. Keeney was unable to produce the telegram, which, he says, he received from plaintiff in response to his letter, submitting to plaintiff the proposition made by Judge Thigpen, and asking whether to accept it or not. His explanation is that he had had occasion to change law offices several times, and was not in the habit of keeping the papers of completed transactions.
Plaintiff testifies that after leaving Shreveport he sought to obtain information from Keeney concerning this stock, but could get no response to his letters. That he came to Shreveport, he thinks, “two years ago” (which would be in 1016, four years after the transfer of the stock, since the trial was in February, 1918), but could not find Keeney, and went away without having seen him, and without having found out anything about the stock.
Keeney testifies that he did not receive the letters which plaintiff thus says he wrote him for information, and he testifies further as follows:
“My impression is that he [plaintiff] came to Shreveport that year [the year in which the transfer was made]. We talked it over, parted good friends, and he was satisfied because at *1089 that time when this sale was made that stock was not worth anything.”
Mr. Horn, secretary of the company, testified that in May or June, 1913, plaintiff came to see him.
“Q. Did he indicate at that time that he knew of the transfer of the stock by Mr. Keeney? A. Why he stated in a general conversation, could not repeat what he said at this late date, but he gave me to understand that he wanted to see Mr. Keeney in reference to the transaction of this transfer of stock, that Mr. Keeney was acting for him, and had not acted satisfactorily, and he wanted to protest to Mr. Keeney. Q. Did he at that time make any protest to you of any kind in reference to the validity of that transfer? A. No way, shape, or form. Q. Did he question- your authority to transfer it? A. Not in the slightest.”
The testimony of these two witnesses is inconsistent with the statement of plaintiff that his coming to Shreveport and seeking to meet Keeney was in 1916. His explanation of why during the four years following the transfer of this stock he took, no further interest in it than, as he says, to write letters to Keeney, which remained unanswered, is that he was without the pecuniary means to do more.
We are bound to believe Keeney and Horn; and we infer from the situation as a whole that in 1913, after the company had begun to be rehabilitated as the result of the financial assistance given it by the defendants and by the good management of its affairs by defendants, plaintiff’s interest in this stock revived, and he came to Shreveport to ascertain whether he could *not set up some claim to it, and, on ascertaining that he could not, was retrospectively displeased with what Keeney had done, but realized that it was binding on him, and that Keeney was not to blame.
In 1917 plaintiff came from Oklahoma to Shreveport with a lawyer to make an investigation, and some six months thereafter, in December, 1917, filed the present suit. He testifies that as the result of this investigation he for the first time became informed of the fact that this stock had been transferred to defendants in January, 1912.
[2] The suit is to recover the stock, on the ground that Keeney was unauthorized to make the transfer; that the contract by which this transfer was made was a compromise, and that the mandate for making a compromise must be special and express, and in writing, and that the hereinabove transcribed power of attorney to Keeney is not of that character.
In our opinion the said contract was not a compromise. Article 3071, O. C., defines a compromise as follows:
“Art. 3071. A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
“This contract must be reduced into writing.”
Tt will be noted from this definition that a compromise is an “adjustment of differences.”
“A compromise can bear only On things doubtful and contestible. If there was the abandonment of an indisputable right [droit certain], there would be a sale or donation.” Dalloz, Codes Annotés, art. 2044, citing authorities.
“It has been accordingly decided that a transaction can be considered to be a compromise only in so far as it has had for its object the ending or preventing of a lawsuit by reciprocal concessions.” Id.
“Its object must be the ending or preventing of a-lawsuit; consequently, something doubtful or subject to contestation.” Mourlon on art. 2044, C. N.
There was nothing doubtful or in contestation between the parties. Harman held plaintiff’s uncontested note.. The contract theretofore made for the transfer of 10 shares of plaintiff’s stock in full ownership, and the placing of the 40' other shares in the hands of *1091 a trustee, had been carried out by the transfer of the 10 shares to defendants and the delivery of the 40 shares to a trustee, and that contract was evidenced by a notarial act. The two defendants were not .pretending to any rights beyond those expressly named in this notarial act. Plaintiff was not contesting these rights. True Mr. Keeney had for a while entertained some notion that perhaps this contract was invalid; but he had already abandoned that notion as being entirely unfounded. A lawsuit was being threatened against plaintiff, but on the note only. There was absolutely nothing else to sue upon. True, also, the act of transfer recites that a further consideration of the transfer was the release of plaintiff from “all obligations under his agreement embodied in” his letter of September 1, 1911. But the obligations that had rested upon plaintiff under said agreement (namely, those of transferring 10 shares of his stock to defendants and delivering the 40 other shares to a trustee in pledge) had already been carried out, and the only obligations remaining unfulfilled under said agreement rested exclusively upon the stock itself, in rem, and had necessarily to become extinguished by confusion .the moment defendants became the owners of the stock. All that part of the act of transfer relating to the release of plaintiff from obligations under the said agreement embodied in his letter of September 1, 1911, was therefore mere unsubstantial verbiage, neither adding nor detracting anything in the substance of the contract. In order that there should be a compromise' there must be something to compromise. The transfer was a dation en paiement, and did not lose its character as such from-the fact that a lawsuit was being threatened. A person threatened with a lawsuit on a debt which he cannot and does not contest does not compromise, but simply pays when he transfers to his creditor something other than money which the creditor is willing to receive in payment.
And there is nothing contrary to all this in the decisions cited by the learned counsel of plaintiff. Thus:
The contract in the case of Antoine v. Smith, 40 La. Ann. 560,4 South. 321, was distinctly a compromise. Antoine was claiming ownership of 200 shares of the capital stock of the Louisiana Lottery Company, which he for convenience had put in the name of one Geo. L. Smith, who had transferred same to the defendant, D. D. Smith. Antoine contended that D. D.. Smith knew that Geo. L. Smith’s title was purely simulated. D. D. Smith contended the contrary, and Antoine was threatening suit when the parties compromised by I>. D. Smith giving Antoine $2,600, and Antoine relinquishing all claims to the stock and against the estate of Geo. L. Smith. There was no contention of this contract not having been a compromise; but the contention was that as a compromise it was not binding because the instrument drawn up for evidencing it did not contain the phrase “for preventing or putting an end to a lawsuit.” All that the court decided in the case was that this phrase is not sacramental.
In Calhoun v. Lane, 39 La. Ann. 594, 2 South. 219, the contract was between brother and sister for the settlement of “disputes and differences between them in regard to their respective rights and interests in their mother's succession.” It was distinctly a compromise.
In the next case cited, Jamison v. Pothaus, 26 La. Ann. 63, there was a dispute between the parties on the point of whether the one of the parties, indorser on a note, had been served with notice of protest, and the parties compromised by a new note being executed for a less amount. Distinctly a compromise.
The contract in the instant case was a dation en paiement simply and purely. What *1093 remaining interest, plain tiff had in the stock was transferred to defendant in satisfaction and extinguishment of the $100 note of plaintiff which Harman held.
[3] As a dation en paiement plaintiff assails the validity of the contract on the ground that for a dation en paiement a fixed price is as essential as for a sale, and that in the present contract there was no fixed price; and in support of that contention counsel cite the cases of Pulford v. Dimmick, 107 La. 406, 31 South. 879; Lovell v. Payne, 30 La. Ann. 511, and Kleinpeter v. Harrigan, 21 La. Ann. 196.
Exactly what is meant hy this contention we confess our inability to understand. If plaintiff 'in order to satisfy this note held hy Harman and in order to make sure not to be ever troubled by anything said in his letter of September 1, 1911, gave this stock to defendant in full payment and satisfaction, we cannot see why such a contract should not have been perfectly valid. Contracts of this kind by which property is given in extinguishment or satisfaction of some obligation, are of everyday occurrence—notably where something is given in payment of services, without the value of the services being otherwise fixed— as, for instance, where an interest in a thing sued for is given to a lawyer for the services to be rendered by him'in the suit. Without further analysis of the decisions referred to we will say that what they hold is slmpiy that the minds of the parties must have met on the point of what the thing is given in payment of. When a workman who has done a job consents to receive something other than money as his recompense, and when a lawyer consents to receive from his client a part of the thing sued for in recompense for his services, they do not make a compromise; they simply receive a thing in payment. They do not have to put a money valuation upon the services in order that the dation en paiement should be- valid; all they have to do is to agree as to what is being given and what it is being given for.
[4] The written power of attorney which authorized Keeney to sell the stock did not authorize him to give it in payment; for, however much a dation en paiement may be likened to a sale by articles 2446 and 2659 of the Code, there is this difference between them, that before a dation en paiement can can be made, the existence of a debt must be acknowledged, and the power to do this must be express and special. . O. C. art. 2997. But from a consideration of the evidence as a whole the conclusion is forced upon us that Keeney consented to make the transfer of the stock only after having consulted plaintiff and received his consent.
[5] Plaintiff’s learned counsel say that Keeney is but one witness, uncorroborated, and that the contract was for over $500, and that for proof of a contract of over $500 the testimony of a single witness uncorroborated is insufficient. O. C. art. 2277. Opposed to this, we find that Keeney is corroborated by every circumstance of the case. The stock was valueless, and was not even any longer in the possession of plaintiff, but was in the hands of a trustee for the security of a result hopeless of realization in the collapsed condition of the company. In its valueless and pledged condition it could be of no benefit to plaintiff in Oklahoma, whereto he had permanently removed, whereas the note in full payment of which the stock was proposed to be accepted might come there in the shape of a suit in court to plague him. Keeney had no personal' interest whatever in accepting the proposition; was even unfriendly to the two defendants. His having asked for time in which to consult plaintiffl gives rise to a strong inference that he did consult him, and did receive a favorable answer. Plaintiff’s long inaction in the matter is strong corroboration.
[6] Besides relying upon the fact that *1095 Keeney had authority to make the transfer, defendants pleaded the prescription of three' years by which the ownership of movables is acquired.
In opposition to this plea the learned counsel for plaintiff argue that good faith is required for this prescription, and that the defendants, however much they may have been in actual good faith, must be held to have been in legal bad faith, since they must be conclusively presumed to have known that the1 written power of attorney held by Keeney did not authorize him to make a dation en paiement.
This argument might be unanswerable if the record showed that Judge Thigpen in accepting the transfer for the defendants had based himself exclusively upon this written power of attorney for supposing that Keeney had authority. But the record leaves doubtful whether Judge Thigpen based himself at all upon this power of attorney, or even knew of its existence, though the act of transfer so recites. He received instructions from his clients to make the proposition to Keeney as plaintiff’s agent, and he did so, and he accepted the transfer only after Keeney had asked time to consult plaintiff, and presumably had done so: If Judge Thigpen saw the written power of attorney at all, the effect could only have been to confirm him in the belief that Keeney was the duly authorized agent of plaintiff in the premises, for Keeney had heretofore declined to act on the proposition without having first consulted plaintiff. From January, 1912, when the transfer was made until December, 1917, when this suit was brought, the defendants actually believed, and had reason to believe, that they were the owners of this stock.
The judgment appealed from is set aside, and plaintiff’s suit is dismissed, at his cost in both courts.