IN THE MATTER OF THE ESTATE OF GORDON DUNLAP,
DECEASED.  JOSEPH DUNLAP ET AL. V. JANE
DUNLAP, ADMINISTRATRIX, ETC.

|       |     |
|-------|-----|
| 94    | 11  |
| 119   | 566 |
| 94    | 11  |
| 123   | 259 |
| 94    | 11  |
| f149  | ¹482|

*Gifts inter vivos—Acceptance by donees—Witness—Matters within knowledge of decedent—Waiver.*

1. Donees will be deemed to have accepted a gift, unless the contrary appears, where the donation is for their advantage.
2. The disability of a widow, who claims to be the owner by gift from her husband of certain notes which the heirs seek to charge her with on the final settlement of her account as administratrix, to testify in her own behalf to the entire transaction between herself and husband relative to the gift to her of the notes, is waived by the heirs calling her as a witness, and interrogating her as far as they see fit as to such transaction; citing *Beardslee v. Reeves,* 76 Mich. 661.[1]

Error to Clinton.   (Daboll, J.)   Argued November 2, 1892.   Decided December 3, 1892.

Appeal by heirs from an order of the probate court allowing the final account of the administratrix.   Judgment of circuit court, affirming that of probate court, affirmed.   The facts are stated in the opinion.

*John H. Fedewa* and *Edwin H. Lyon,* for appellants.

*High & Walbridge,* for appellee.

McGRATH, C. J.   This is an appeal by heirs from an order allowing the final account of the administratrix, who is the widow of decedent.   Gordon Dunlap died August 20, 1889, without issue.   He left a large amount of personal property other than the notes in controversy.   The disputed question is as to whether certain notes,

---

[1] See *Lilley v. Insurance Co.,* 92 Mich. 153.

aggregating some $18,000, held by the widow, and claimed by her as a gift from her husband during his life-time, should be inventoried and treated as a part of the estate, and accounted for by her as administratrix.

At the hearing in the probate court the heirs called the widow as a witness, and examined her fully as to the circumstances of the gift to her, and, among other things, she was asked to make out a detailed list of all the notes given to her by her husband, with the date of each, the time, the name of payee, name of maker, place of payment, amount, rate of interest, indorsements of payments, and the history of each note, and furnish the same, which she did. The list was headed, "Memorandum of Notes belonging to Jane Dunlap, given to her by Gordon Dunlap," and the notes ranged from $5 up to $600.

The probate court allowed her account, refusing to treat the said notes as the property of the estate. The heirs appealed to the circuit, and the issue was there narrowed to a question of gift or no gift. On the trial in the circuit court the heirs again called the widow as a witness, who testified as follows:

"I made application for the administration of my husband's estate on the 11th day of September following his death. A few days after my return I was at Joseph Harris' house in Ovid, and had a conversation with him and Mrs. Harris, relating to some notes that I told him Mr. Dunlap had given me more than a year before his death, and told me what to do with them.

"Q. What notes did you refer to?

"A. He had a pocketbook of notes.

"Q. A pocketbook of $18,000 of notes?

"A. Yes, or thereabouts.

"Q. You say you told him your husband had given you these notes more than a year before his death?

"A. Yes, sir.

"Q. What else did you say about it?

"A. I asked him what he thought about it. He said he didn't know; and I said I was going to know,—was

going to find out. I said nothing further to Mr. and Mrs. Harris. This paper shown me, marked 'Exhibit 3,' is a list of the notes making up the $18,000, or such a matter, of notes that I had reference to in my talk with Mr. Harris. The list was made out under my direction.

"*Q.* I call your attention to the headings of the columns, and ask you whether or not these headings represent the various essentials or parts of the notes that they purport to represent.

"*A.* It represents the notes.

"*Q.* You don't understand me. Take the first column, headed 'Date of Note,' and state whether or not that is a statement of the dates of the notes at the time you furnished the list.

"*A.* Yes, sir.

"*Q.* And this list that you have now identified was a list, was it not, of all the notes in your possession at that time that originally made up this $18,000 of notes, or notes purchased with the proceeds or the money paid upon the original $18,000 of notes?

"*A.* Yes, sir.

"*Q.* Is it not a fact, Mrs. Dunlap, that you said to Mr. Harris, 'Suppose that a man should turn over to his wife a bundle of notes, whether or not that would constitute a good gift?'

"*A.* I don't think I put it in that way.

"*Q.* Then, how did you put it?

"*A.* I told him Mr. Dunlap had given them to me, and he told me to give so much to one and so much to the other.

"*Q.* You are sure, now, that you said to him on that occasion, there in the presence of Mrs. Harris, that your husband had given you those notes something over a year before his death?

"*A.* Yes.

"In the spring of 1890, some time, I saw Mr. Van Vleet at my residence in the village of Ovid. He broached the subject of these notes, and told me he was interested in the estate in behalf of some of the heirs. He asked me if I was willing to show him the notes, and I told him: 'No, sir; I didn't have to. When the judge of probate called for them they were ready.'

"*Q.* What did you say to him about your control of the notes?

"*A.* He wanted to know what I did with the money,

and I told him I had deposited it as a separate matter of my own,—of my personal property; and I was to give Joseph $7,000 of this money, and Elon $3,000, and the balance was mine.

" Q. When did you tell him you would pay it to Joseph and Elon.

"A. I was not to pay it until it was collected. I was not to pay it as fast as it was collected, but I was to pay it when I got the amount.

"*Q. Got what amount?*

"*A. When it was all collected.*

"*Q. What amount?*

"*A. Eighteen thousand dollars.*

"*Q. When you got the whole of the notes?*

"*A. Yes, sir.* I didn't have to pay it to them until after Mr. Dunlap's death.

"Q. Is that what you told him, or are you telling something else?

"A. That is what I told him.

"Q. You told him you didn't have to pay it to them until after Mr. Dunlap's death?

"A. No, I did not have to.

"Q. Did you say you didn't have to until after Mr. Dunlap's death?

"A. No; not until I settled up the estate.

"Q. When did you tell him that,—the first time or the second?

"A. I don't know.

"Q. Did you tell him anything further, with reference to the notes, upon either of these occasions?

"A. I think not.

"Q. Have you those notes with you, Mrs. Dunlap, making up the $18,000 of notes, or the notes purchased with their proceeds?

"A. Yes, sir.

"Q. I wish you would produce them. (Witness produces notes.)

"Q. What do you say as to whether or not these 12 notes that I show you are a part of the notes that you had reference to as making up the $18,000 of notes?

"A. These are part of the notes.

"The notes marked 'Exhibits 4, 5, and 6' were included in that $18,000. I know John Van Sice and his wife, of Ovid. I have known them four or five years. I was at their house several times after the death of my husband.

Upon one of these occasions I remember having a conversation with Mrs. Van Sice about these notes. None of the three had been paid at that time. Mrs. Van Sice asked me to consent that the payment on the notes be extended. I told her if the money was mine it would be different.

"*Q*. Did you not tell her that these notes constituted a part of the estate of Mr. Dunlap?

"*A*. No, sir.

"*Q*. Didn't you further tell her, in that connection, if the money was yours it would be different?

"*A*. I said if all the money was mine. I told her I intended to collect the notes, and pay up the heirs with the money, and hold the mortgages.

"*Q*. You say that you told her that if the money was all yours it would be all right, but you intended to collect up the interest and pay off the heirs and hold the mortgages?

"*A. Yes, sir; the notes were mine.*

"*Q. The notes were yours, and you intended to do that?*
"*A. Yes.*

" I didn't tell her the notes constituted a part of the estate of Mr. Dunlap, and I had to have them paid because I had to settle up the estate. This was along in the winter of 1889-90. I was, as a matter of fact, collecting the money in on the notes at that time, and was not renewing them. I never had a conversation with Mr. or Mrs. Van Sice, after my husband's death, in which I stated that I had attempted to get my husband to make a will, or to deed me some of his property; nor did I state to Mrs. Van Sice, in the conversation referred to, that I had attempted in my husband's life-time to get him to make some provision for me, but that he had declined to do so, saying the law was good enough for me. I never made such a statement to Mr. Van Sice, either."

The heirs then called Mr. Van Vleet, Mrs. Van Sice, John Van Sice, Mrs. Harris, and Joseph Harris as to the conversations had with the administratrix after her husband's death. Two or three other witnesses were called, who testified to dealings with decedent, as to their notes, which were included in the list, relative to payments of interest, extensions of time, etc., after the date of the

alleged gift.    The list of the notes was then put in evi-. dence, and the heirs rested.    The administratrix was then recalled by her own counsel, and permitted to go fully into the transactions between her husband and herself, relative to the gift, her continued possession of the notes, and her husband's agency for her respecting them.

The jury found for the appellee, and the heirs bring the case here for review.

The principal controversy is as to the admissibility of the testimony of the appellee.    We think that the question is ruled by *Beardslee v. Reeves,* 76 Mich. 661.    That was trover for the conversion of certain notes and a mortgage, which defendant claimed as a gift from his father before his father's death.    Defendant was summoned into the probate court by the administrator, to answer interrogatories as to the disposition of the property in dispute. On the trial in the circuit the stenographer who took the minutes of defendant's testimony in the probate court was called, and read from his minutes, to show that defendant testified that he had the notes in his possession, and that he had received the money on the mortgage.    On cross-examination the stenographer was asked if defendant did not also state on that examination that his father, before he died, gave and delivered the mortgage to him, to which question, under objection, he answered, "Yes."    The Court say:

"It is contended that this was testimony of a fact equally within the knowledge of his father, now deceased, and consequently barred by the statute above noted. We think the testimony, under the circumstances, was admissible.    It would seem that upon the inquisition in the probate court the disability of the defendant to testify under this statute was waived by the plaintiff.    But, whether this was so or not, if any part of such examination was used by the plaintiff in the circuit court, the defendant was entitled to the whole of his testimony given

on such examination, or such parts thereof as he deemed material.' See *Smith's Appeal*, 52 Mich. 415."

In the present case the widow was not only called to the witness-stand in the probate court, interrogated fully as to the transaction between herself and husband, and asked to make out a list giving the history of the notes, but she was called to the stand in the circuit court, asked to produce the remaining notes, which she did, her attention was called to the list which she had made, and the same was identified, and introduced in evidence. This list showed that several of the notes had been renewed during the life-time of her husband, and after the date of the alleged gift; that several of these renewal notes had been taken in her husband's name; and that others had been paid to her since her husband's death, and the amounts appropriated by her. The other testimony brought out upon her examination by counsel for the heirs cannot be said to have been confined to admissions made by her after the death of her husband. The widow's disability was waived, not only in the probate court, but in the circuit. The heirs could not be allowed to go into matters equally within the knowledge of the deceased, so far as they deemed necessary to charge her with these notes, and then revive her disability, so as to prevent her from giving the entire history of the transaction, and thus explain what had been drawn out by counsel for the heirs.

There is no force in the objection that there could be no valid gift to Joseph and Elon without an acceptance on their part. The donation being for their advantage, they will be deemed to have accepted it, unless the contrary appears. *Preston v. Sonora Lodge*, 39 Cal. 116; *Howard v. Bank*, 40 Vt. 597; *Bostwick v. Mahaffy*, 48 Mich. 342.

We find no error in the record, and the judgment is affirmed, with costs to appellee.

The other Justices concurred.