WILLIAM A. HARRIS ET AL. *v.* JOEL B. HARRIS'S ESTATE.

January Term, 1909.

Present: ROWELL, C. J., MUNSON, WATSON, and HASELTON, JJ.

Opinion filed May 17, 1909.

*Wills—Construction—Vesting of Legacies—Advancements—
Gifts—Delivery and Acceptance—Presumption—Arbitra-
tion and Award—Effect of Award—Consent Judgment—
Effect—Executors and Administrators—Final Account—
Res Judicata.*

Under a will providing that a trust created thereby should terminate
when testator's wife reached the age of 75 years unmarried, and
that thereupon the trustee should reserve money for certain
purposes, and then divide the estate "so soon as may be" into equal
shares, and distribute it among those of testator's children "then
surviving," the legacies to his children vested immediately upon
his widow reaching the age of 75 years; and any postponement
till division by the trustees was not of the vesting of such legacies,
but only of their possession.

The rule that the law favors the early vesting of estates is subordinate
only to the rule that in the construction of wills the testator's
intention, so far as it may be legally effected, is to govern.

A testator, leaving a second wife and children by both wives, made
provisions in his will for his widow, through a trust conditioned
on her claiming nothing from his estate except under the will,
and therein requested that she from time to time divide among all
his children her surplus income derived from the provisions of the
will, and then declared that it was his will that his children
by his first wife should receive the same ultimate benefit from
his estate as those by his second wife, and directed his trustees
to make special provision for his children by his first wife, if
his widow should waive the provisions of his will in her favor or
should not make the requested equal distribution of her said
surplus income. *Held*, that no special provision was to be made
by the trustees for the children of the first wife, in consequence of
the fact that after the will became operative a child of the second

wife died, and the share of such child under the will was inherited by the testator's widow.

Under a will providing for equal distribution among testator's children, taking into account such advancements made to them as might appear on testator's books at his decease, gifts so shown to be treated as advancements, the merger by testator after the execution of the will of gift accounts and advancement accounts, and the erasure of the word "gift" from the heading "gift account," in the only account he had with one child, are immaterial; and all such accounts are to be considered in the distribution.

Not only may references by a testator to his books of account, so far as they contain entries made before the execution of the will, be considered in the distribution of the estate, but a legacy may be made dependent in whole or in part on some future event.

A testator may by his will refer to previous advancements and gifts in such a way that they must be considered in the distribution of the estate, and may also effectually provide that a legacy shall be reduced by subsequent gifts and advancements, and that no gift shall be treated as an advancement unless charged by him on his books of account.

Where a will provides that gifts and advancements as they may appear on testator's books at his decease shall be deducted from certain legacies, and refers to some of the advancement accounts as accounts on which interest had been computed and charged, he may, without a later will or codicil, convert such interest charges into absolute gifts, not to be treated as advancements, by subsequently cancelling them with that intention.

A gift is perfected by delivery and acceptance; and it is immaterial whether delivery and acceptance are contemporaneous or which precedes the other.

The contrary not appearing, it will be taken that an absolute gift from father to child is beneficial to and accepted by the child, though the child be ignorant of the transaction.

Where a will designated as "advancements" payments or gifts to testator's sons appearing on testator's books at his decease, and thereafter testator and one of his sons agreed that the son should transfer certain corporate stock to testator and receive a specified credit therefor on his advancement account, which agreement was fulfilled, the subsequent erasure of the credit by testator did not affect the son's rights thereto, as the transaction was a completed contract; the contrary, however, was true as to another

son, to whom testator made a similar offer and gave a like credit, but the offer was not accepted, and the stock never transferred.

As to matters submitted, the award of an arbitrator duly made and published has the force of a judgment.

A judgment rendered by the county court, by agreement of all parties before it, affirming the judgment of the probate court, is not affected by the fact that one of the original parties in probate court, but who did not appeal, was not a party to such agreement.

A judgment on the merits, rendered by consent, is as conclusive as one rendered in the ordinary course. Contrary intimation in *Vermont & Canada R. R.* v. *Vermont R. Co.* 50 Vt. 500, *held obiter dictum.*

A judgment of the probate court settling the final account of the executors of a will that gives property in trust was a final one, and the distribution by which the trustees took was a final distribution so far as the executors were concerned; so that matters covered by that judgment are not open on distribution of the trust estate at the termination of the trust.

On final decree of distribution of a trust estate, at the terminaion of the trust, interest at the legal rate was properly charged against advance payments, in the nature of partial distribution, made from time to time to some of the beneficiaries.

APPEAL by William A. Harris and others from a decree of probate court making final distribution of the estate of Joel B. Harris, deceased, testate. Trial by court at the March Term, 1907, Rutland County, *Powers,* J., presiding. Judgment *pro forma,* on the facts found, affirming the decree of the probate court, excepting the correction of a manifest error in computation. The appellants excepted. The opinion states the case.

*Butler & Moloney* and *F. S. Platt* for William A. Harris et al.

The will by its terms incorporates therein certain accounts in the testator's books, as they shall appear at his decease. Where the language is doubtful, or the papers to be incorporated into the will are in question, parol evidence as to the facts and circumstances is admissible. *In re Welch's Will,* 77 Vt. 16; *McKeough* v. *McKeough,* 69 Vt. 41. If the doctrine of incorporation of papers into a will by reference obtains in this State,

two things are necessary: First, the paper sought to be incorporated must be in existence at the time of the execution of the will; Second, the description must not be so vague as to be incapable of being applied to any instrument in particular. Its identity, from the will itself, must be free from doubt. The document or papers sought to be incorporated must not only be in existence at the time of the execution of the will, but must also be referred to therein as existing at that time. *Bryan's App.,* 77 Conn. 240; *Malter* v. *Young,* 123 Cal. 337; *Newton* v. *Seaman's Friend, etc.,* 130 Mass. 91; *Ela* v. *Edwards,* 16 Gray 91; *Matter of Shillaber,* 74 Cal. 144; *Matter of Willey,* 128 Cal. 1; *Hathaway* v. *Smith,* 79 Conn. 506. If the testator could alter his will, after it was made, by adding thereto a credit, thus making a further bequest to Charles, without attestation or formality, he could erase the entry and alter the legacy. Any alterations made by the testator, not amounting to a revocation of the will, should be ignored in the distribution. The alterations in the account did not change the will, neither do they invalidate it, but the will as it stood at the time it was executed must stand. *In re Knapen's Will,* 75 Vt. 146; *Wheeler* v. *Bent,* 7 Pick. 61; *Bigelow* v. *Gilbert,* 123 Mass. 102, 25 Am. St. Rep. 32.

Alterations in a will complete without them are presumed to have been made after its execution and are void. 29 Am. & Eng. Enc. 259; *Wheeler* v. *Wheeler,* 47 Vt. 640; *Booth* v. *Baptist Church et al.,* 126 N. J. 215; *Matter of O'Neil,* 91 N. Y. 515; *Stevenson* v. *Earl,* 65 N. J. 721, 1 Am. Ann. Cases 49; *Thayer* v. *Wellington,* 9 Allen 283; *Tucker* v. *Seaman's Aid,* 7 Metc. 204.

*M. C. Webber, O. M. Barber* and *E. J. Waterman* for Charles P. Harris and Susan Mather Waterman.

The court erred in decreeing anything to the estate of Harriet L. Harris.

The gift to Harriet L. Harris under this article of the will is a contingent interest. She should take only in case she should be living at the time when the interest should vest. "But a devise to individuals by their names, to be divided at the death of a life tenant, share and share alike, among those of the original devisees 'then living,' is contingent on the survivorship of the devisees, and the descendants of one who dies during the life tenancy takes nothing." The testator evidently had this

principle of law in mind, for he takes care to say that the children of any deceased children shall take the parent's share. Underhill on Wills, §866, p. 1311; *Wilhelm* v. *Caldwell,* 71 N. W. 214; *Andrews* v. *Am. Bible Soc.,* 4 Sanford 156.

An award ordinarily has the force of a judgment and concludes the parties from litigating the matters submitted to the arbitrators on any subsequent occasion; and when the submission is acquiesced in by both parties has as to them the effect of a final judgment. 1 Herman on Estoppel and Res Judicata, §442; *Morse* v. *Bishop,* 55 Vt. 231; *Pease* v. *Whitton,* 31 Me. 117; *Doe* v. *Prosser,* 3 East. 15; *Lloyd* v. *Barr,* 11 Pa. St. 41; *Parks* v. *Smith,* 19 L. J. Q. B. 405; *Hawkins* v. *Colclough,* 1 Burr. 274; *Jarvis* v. *Fountain,* 5 Cal. 179; 3 Cyc. 728; *Barker* v. *Belknap,* 27 Vt. 700; 1 Van Fleet's Former Adjudication, p. 86; *Cary* v. *Wilcox,* 6 N. H. 177, 179; *Gueret* v. *Audony,* 62 L. J. Q. B. 633.

HASELTON, J.   The late Joel B. Harris executed his last will April 16, 1891, and executed a codicil thereto the following day, April 17, 1891.   About six months later, that is October 19, 1891, he died.   By his will he left his entire estate to his sons, Charles P. Harris and William A. Harris, in trust for certain declared purposes.   Among other things that the trustees were to do they were to carry out his directions in respect to the support and comfort of his wife, Mary G. Harris, and to pay certain annuities and legacies.   The provision for his wife was partly by way of an annuity.   The 13th article of the will was as follows:

"The aforesaid trust, created by this will shall continue until my said wife shall reach the age of seventy-five (75) years, unless she shall sooner marry, in which case it shall terminate at her marriage, and also at her decease.   If she unmarried reaches the age of seventy-five (75) years, I direct said Trustees to reserve a sum sufficient to pay all then unpaid legacies, given by this will, and also the sum of fifty thousand ($50,000) dollars to provide for the annuities thereafter to be paid, and then taking into account the advancement herein mentioned to each of my children, and the money legacies, other than annuities, herein given, to divide my estate so soon as may be into equal shares; and to distribute it among those then surviving of my children, viz., Charles P. Harris, Martha Vaughan Newell, William Allen Harris, Harriet Lester Harris, Nellie Seaver Bowles, Mary Gard-

ner Harris, and Susan Harris Mather,—the latter being a grand-child—and if any of them shall not then be living, but shall have left living issue, then such issue shall take the share which the parent would take if living.

A like division shall be made if this trust terminates other-wise than by my said wife reaching the age of seventy-five, except that no sum shall be reserved to pay her future annuity.''

The testator had the children and the grandchild named in the article of the will just quoted. The grandchild was the daughter of a child who had died long before the making of the will. Throughout this opinion she will, in general, be included among those spoken of as children. His widow remained un-married and reached the age of 75 years January 18, 1905. The children were then all living, but Harriet Lester Harris died about a year and five months thereafter, the exact date of her death being June 27, 1906. This was before the decree of dis-tribution and before the trustees presented to the probate court their final account. All parties interested appealed from the decree and this case is here on exceptions, by all parties, to the judgment of the county court. Actual distribution has, there-fore, not yet been made.

In the distribution ordered by the probate court and fol-lowed in the county court, the estate of the daughter Harriet was made one of the distributees. It is claimed by Charles P. and Susan that this was error. Stress is laid upon the word ''then'' in the article of the will directing the trustees to divide the estate ''so soon as may be'' into equal shares and to distribute it among those then surviving of the offspring name. It is claimed that the ''then'' referred to relates to whatever time may be indicated by the words ''so soon as may be.'' But the ''then'' in question is the third of a series each of which clearly relates to the time when the widow reaches the designated age. If the words ''so soon as may be'' were omitted the meaning of the paragraph in question would not be changed, for the division and distribution could not be made anyhow until so soon as might be after the happening of the event which determined who the dis-tributees should be. The actual payments could not be made, whatever the condition of the estate, instantly upon the happen-ing of the determinative event, and the words ''so soon as may be'' indicate nothing more than the desire of the testator that the possession and enjoyment of their own should be withheld from

the legatees no longer than might be necessary. It is true that the gifts in question are made only by words directing division and distribution. But notwithstanding this, and assuming, what we do not hold, that the words "so soon as may be" are words of postponement, still, as such assumed postponement relates merely to the situation and character of the estate and the convenience of the trustees, the vesting of the legacies was not postponed but their possession and enjoyment only. *Weatherhead* v. *Stoddard,* 58 Vt. 623, 5 Atl. 517, 56 Am. Rep. 573; *Tucker's Will,* 63 Vt. 105, 21 Atl. 272, 25 Am. St. Rep. 743; *Scofield* v. *Olcott,* 120 Ill. 362, 11 N. E. 351.

In harmony with what has been said is the rule that the law favors the early vesting of estates; a rule which is subordinate only to the prime rule in the construction of wills that the intention of the testator, so far as it may be legally carried out, is to govern. *Weatherhead* v. *Stoddard,* 58 Vt. 623, 5 Atl. 517, 56 Am. Rep. 573; *Burton* v. *Provost,* 75 Vt. 201, 54 Atl. 189; *Jones* v. *Knappen,* 63 Vt. 391, 22 Atl. 630, 14 L. R. A. 293; *Tucker's Will,* 63 Vt. 105, 21 Atl. 272, 25 Am. St. Rep. 743.

It will be noted that the Tucker case involved the consideration of the force of the adverb "then" as used in the will there construed.

The will, as is argued, expresses the general purpose that, so far as might be, the testator's "surviving children" should share equally in his estate. But the testator certainly did not contemplate that they would all die at the same time. Some would inevitably survive others. The will was made in 1891 when his wife was 61 years of age. If she should remain unmarried until she reached the age of 75 years, his children who lived beyond that time were the "surviving children" intended. The daughter Harriet, who never married, survived to the end of that period, and for a year and five months longer; and during that year and five months, the closing period of her life, she had the right to, though not the possession of, her equal share, which she might have disposed of by will if she had chosen, but which, by dying intestate, she allowed to go to her mother.

Had the will provided that if any of the testator's children should die before "receiving" his share of the trust estate such share should go over, a different, but very interesting, question would arise. There is strong authority for saying that in such case the child's estate would take his share if the child lived

until such share became in law "receivable." But the question last suggested does not here arise. An equal share in the fund to be distributed vested absolutely in the daughter Harriet at the time when her mother reached the age of 75 years and the trust terminated.

Mary G. Harris was the second wife of the testator, and Charles and Susan were the offspring of his first wife. The provisions made by the testator for his wife were expressed to be in lieu of any claim on her part for anything out of his estate not provided for by the will whether by way of dower, homestead, assignment or otherwise, and were made a condition that she should claim nothing from his estate except under the will. The testator considered, as the will states, that he had made a better provision for his widow than the law would make and that she would save a part of her yearly income, and such saving he requested her to divide "from time to time or at her decease" equally among all his surviving children and the children of his deceased children, and he provided as follows:

"It is my will that my son Charles, and my granddaughter Susan, offspring of my first wife, shall each receive the same ultimate benefit from my estate as the children of my second marriage, whether my wife shall abide by the provisions of this instument or shall waive them and take the provisions made for the widow by the laws of any state; and to that end I direct that if my said wife shall, under the laws of any state, claim and receive from my estate any property or money otherwise than under the provisions of this will, or of some codicil thereof, then shall the said Trustees set apart out of the general fund of my estate, a sum at least equal in value to two-fifths of the amount so received by my said wife outside the provisions of this will, which special fund shall be held and invested until after the decease of my said wife."

In the body of the will the testator makes the further direction that if his wife shall not by gift or will make the requested equal distribution of the property in her possession derived from him or his estate, then the trustees before mentioned shall distribute the special fund set apart in such manner as to effectuate the desired equalization.

In the codicil to his will the testator says with regard to any special fund that it "shall not be held until the decease of my said widow, but shall be divided into equal shares between my

son Charles and my granddaughter Susan, so soon as possible after my said widow shall receive, if at all, any property or money by reason of having waived any of the provisions of this will.''

Charles and Susan now claim that if the Court holds, as it does, that the share of Harriet vested in her lifetime and so was inherited by her mother, the trustees should be directed to deduct from the general fund and divide between Charles and Susan a sum equal to two-fifths of such share. But the codicil and will are to be construed together. *Lyman* v. *Morse,* 69 Vt. 235, 37 Atl. 1047 ; *Thompson* v. *Churchill,* 60 Vt. 371, 14 Atl. 699 ; *Barnes* v. *Hanks,* 55 Vt. 317, and after referring to the codicil we do not think it necessary to discuss this claim. The testator had in mind nothing more than the possibility of an unequal distribution consequent upon a waiver of the will by his widow, and the resulting acquisition by her of a portion of his estate emancipated from the provisions of the will.

We come now to the consideration of the general plan of distribution adopted by the probate court and followed by the county court. As appears by article 13, already quoted, the trustees were to make distribution into shares which should be equal, taking into account the advancements named in the will and the money legacies other than annuities thereby given.

Articles 7, 8, 9 and 15 taken together clearly express the same idea of equal distribution among all his children, and further show that the advancements contemplated are such as might appear upon his books, at his decease, and that gifts so shown were to be treated the same as advancements. For a long time before making his will the testator had kept in a book an advancement account with some of his children, and, with those who became of age before January 1, 1891, he had kept, in the same book, a gift account. These accounts were in his own handwriting. After the making of the will and codicil the testator merged the gift accounts in the corresponding advancement accounts, but this merger was a mere matter of bookkeeping and is immaterial, since, as we have seen, by the provisions of his will, gifts and advances appearing by his books were to stand alike in their effect upon the distribution of the estate.

For the sake of accuracy it should be added that with the daughter Harriet the testator kept no account entitled ''ad-

vancement account" but that he had, on the book referred to, an account with her, originally headed "gift account," and that at the time of the merger or transfer, above referred to, he erased the word "gift" with the intention of having the account thereafter stand as an advancement account. In any view the account belonged to the class of accounts which under the will were to be considered in the distribution.

Shortly after making the will and codicil the testator charged his daughter Martha $48, and his daughter Nellie $150. The charges were made in their respective advancement accounts. Each charge represented money actually advanced.

In its decree of distribution the probate court undertook to give effect to all the provisions of the will as to the application of money legacies, and of advancements so far as they had been made and appeared on the books of the testator. Charles and Susan maintain the correctness of this course, but it is challenged, in some respects at least, by counsel for the other distributees. No reference is now had to the question of whether or not the advancement account of Charles should or should not be $20,000, more than the probate court made it in consequence of matters which will be treated separately.

The plan of distribution adopted by the probate court was correct. While it is true that the doctrine of advancements finds its primary application in the distribution of intestate estates, still one may by will refer to previous advancements and gifts in such a way that they must be taken into consideration in the distribution of the estate. *Younze* v. *Flory,* 77 Ohio St. 71, 83 N. E. 305; *Brown* v. *Brown,* (N. J. Ch.) 65 Atl. 739; *Williams* v. *Freeman,* 83 N. Y. 561; *Appeal of Mengel,* 116 Pa. 292, 9 Atl. 439; *Bradlee* v. *Andrews,* 137 Mass. 50; *Baker* v. *Safe Deposit & Trust Co.,* 93 Md. 368, 49 Atl. 623; *Manning* v. *Thurston,* 59 Md. 224; *Appeal of Wagner,* 38 Pa. 122; *Lawrence* v. *Lindsay,* 68 N. Y., 108; *McKibben's Estate, In re,* 56 Atl. 62, 207 Pa. 1; *Moore, In re,* 61 N. J. Eq. 616, 47 Atl. 731; *Robert* v. *Corning,* 89 N. Y. 227.

And though a testator may contemplate that gifts or advances in his lifetime to be made after the making of his will shall be counted in the distribution of his estate, his intention in that regard when clearly expressed will be carried into effect. Not only may references by a testator to his books of account, so far as they contain entries made before the execu-

tion of the will, be used in determining the distribution of the estate, but a legacy may be made dependent in whole or in part upon some future event.

We do not here hold that the mere act of charging a sum as an advance, done by the testator after the making of his will is of effect. However, a testator may effectually provide that the amount of a legacy shall be reduced by gifts or advances which he may actually make in his lifetime, and he may provide that no gift shall be treated as an advancement unless it is charged on his books of account.

The conditions now under consideration which were to affect the distribution under the will were the actual making of advances by the testator in his lifetime and the entry of the advances as such on the books of the testator by him. The provisions of this will do not incorporate or attempt to incorporate into the will any book or other evidence of the gifts and advances, and the question of what is necessary to the incorporation into a will of a paper referred to therein does not arise in this case. The will expresses the full testamentary purpose of Joel B. Harris but provides that the amount of certain legacies should be determined, upon distribution, by facts or events or conditions which the testator left to future ascertainment. This it might do. *Hoak* v. *Hoak,* 5 Watts, 80; *Moore, In re,* 61 N. J. Eq. 616; 47 Atl. 731; *Musselman's Estate, In re,* 5 Watts, 9; *Gilman* v. *Gilman,* 63 N. Y. 41; *Lawrence* v. *Lindsay,* 68 N. Y. 108; *Langdon* v. *Astor,* 16 N. Y. 26; *Robert* v. *Corning,* 89 N. Y. 225; *Holmes* v. *Coates,* 159 Mass. 226, 34 N. E. 190; *Cumings* v. *Bramhall,* 120 Mass. 552; *Treadwell* v. *Cordis,* 5 Gray, 341; *Coyne* v. *Boyce,* 78 Md. 72, 26 Atl. 1021; *Blackstone's Appeal,* 64 Conn. 414, 30 Atl. 48.

Here the fact is found as to what the actual advances made by the testator after the making of the will and codicil were, and so far as they correspond to advances charged by the testator they should have been and were taken into account by the probate court in decreeing distribution.

There is in this case no question as to the identity of the books of account and of the accounts in question.

The doctrine of the partial ademption of money legacies by the payment of money to the legatee subsequent to the execution of the will is not involved here, for the question here is as to the construction of the will in connection with the inquiry

14

as to what does and what does not constitute an attempted alteration of the will.    But the doctrine of the ademption of legacies, in whole or in part, is referred to, since it shows conclusively that dealings of a testator with his estate and with his legatees, after the making of his will, may affect and determine the application of the provisions of the will.

In the several advancement accounts kept by the testator interest had been regularly computed and charged up, but after the making of the will and codicil all such charges were credited back by the testator.    In doing this the testator may have been influenced by the general principle of law that advancements proper do not bear interest during the life of the testator.    *Black* v. *Whitall,* 1 Stockton's Ch. (N. J.) 572, 59 Am. Dec. 423; *Jackson* v. *Jackson,* 64 Am. Dec. 114 and note; Note to *Miller's Appeal,* 80 Am. Dec. 564, 565; *Hall* v. *Davis,* 3 Pick. 450.    But the motive of the testator is immaterial.

In his will, indeed, he refers to these advancement accounts, or some of them, as accounts on which interest had been computed and charged up, and it is, in effect, claimed that in cancelling these interest charges after the making of his will he attempted to alter the plan of distribution provided for by the will, a thing which he could do only by a later will or codicil duly executed.    But if the interest on the advancements be treated as a part of the advancements, nevertheless, Mr. Harris might cancel such portions of the advancements and turn them into absolute gifts, and he might do this in the way in which he did.    No man's will prevents him from making gifts in his lifetime, and gifts so made do not in any proper sense affect the distribution of his estate, for his estate is the property which he leaves at his death.    The right to give imports the right to make an advancement and then to make an absolute gift of the advanced property.    *Wheeler* v. *Wheeler's Estate,* 47 Vt. 637.

A gift is perfected by delivery and acceptance and it is immaterial whether delivery precedes or follows or is contemporaneous with the acceptance, and it will be taken that an absolute gift from a father to a child is beneficial to the child and is accepted by him unless the contrary is shown, and this though the child may be ignorant of the transaction. *Church's Exr.* v. *Church's Est.,* 80 Vt. 228, 67 Atl. 549; *Sparks* v. *Hurley,* 208 Pa. St. 166, 57 Atl. 364, 101 Am. St. Rep. 926; *Dunlap* v. *Dunlap,* 94 Mich. 11, 53 N. W. 788.

The conversion of an advancement into an absolute gift is a very different thing from the conversion of an absolute gift into an advancement. The latter can be done only by consent of the donee or by a later legally executed will which deducts the amount of the absolute gift from the share of the donee.

As preliminary to the consideration of a principal question in the case we quote article 10 of the will which is as follows:

"Upon my books of account there appears charged to my sons, Charles P. and William A. Harris, a considerable amount of money, on which interest has regularly been computed and charged up. A large part of this amount represents money invested in the business in Rutland, in which they have been interested with me as stockholders, and which may not be worth the full amount originally charged to them. It is my will that from the general assets of my estate there shall be paid to that one of my said sons who shall have received the lesser amount, appearing as aforesaid on my books, at my decease, a sum sufficient to make him equal with the other son, interest being cast to the date of payment; and it is my will that the balance of the amounts so charged to my said sons, respectively, with the amount so paid to equalize their accounts, shall be treated as advancements towards their respective shares, upon the final distribution of my estate, as hereinafter provided, like the sums of fifteen thousand dollars each, herein apportioned to my daughters; and that my sons shall make no claim for services to be rendered either as executors or as trustees under this will."

On the same question we quote from the findings of facts the following:

"At the time the codicil was executed, Charles P. owned 350 shares of the capital stock of the Harris Manufacturing Company, a corporation in which the testator was largely interested. William A. owned 150 shares of the same stock. This stock was of some, but doubtful value. By an arrangement between Charles P. and his father, the latter agreed to take this stock and credit it on the respective advancement accounts. This arrangement was made April 17, 1891, but whether before or after the execution of the codicil we are unable to find. The only evidence of this agreement is the two memoranda on the

advancement accounts herein referred to, and the receipt of April 22, 1891, signed by C. P. Harris.''

The arrangement with Charles as to his block of stock was carried out; the 350 shares became the property of the father and the latter made an entry on the advancement account of Charles to the effect that there was to be a credit of $20,000, on such account by reason of the purchase of such shares.

This entry was in pencil and was afterwards erased by the testator by the use of a rubber eraser with the intention of obliterating the entry, but it was found possible to decipher the words of the entry. At the same time the testator made an entry in pencil on the credit side of the advancement account of his son William to the effect that there was to be a credit to him for some sum for his 150 shares to be made when the father should see the son William, and a direction that if the father died before making the credit regularly the credit should nevertheless be allowed. This memorandum also the testator purposely erased before his death but like the other it could be deciphered. However, William's stock remained his property and his father never became the owner of it.

The receipt referred to in the findings of the court was a paper signed by Charles and found in the testator's pocket after his death. It read as follows: ''Rutland, Vt., April 22, 1891. Received of Joel B. Harris 350 shares of the Harris Manufacturing Company, which I agree to hold in his interest, the same having been disposed of to him as per special agreement made at Rutland, Vt., April 17, 1891. All right, title, and claim to the same is hereby waived while the same stands in my name on the Company's books, in accordance with the agreement made with the above, in view of which he is to make credit for the same in the account standing against me upon his private books as proposed by him and agreed to by me.''

It is claimed in behalf of those who insist that Charles is not entitled to the credit of $20,000, on his advancement account that a certain letter written by Charles to William in May, 1891, found in the recitals of the Wheeler award, hereafter to be referred to, was before the county court as evidence. The letter is as follows: ''Father has taken the stock in the H. Mfg. Co. off my hands and credited it in account at a valuation fixed by himself, with the agreement that he will take yours and treat it in the same way—but probably at a higher rate, as you

have less of it. He does this so as to have less charged against us both in case of his death. You will be perfectly satisfied with the arrangement I have no doubt.''

As the authenticity of the letter is not questioned, and as the court must have seen it or a conceded copy, we treat it as having been before the trial court for what it is worth against the writer, although it is not referred to in the findings.

It is urged that the findings disclose an entire contract between the testator and Charles by which the testator agreed to take both blocks of stock and Charles agreed to deliver both, and that since both blocks were not delivered there was no contract obligation on the part of the father to make any credit whatever. But there is nothing in the evidence mentioned to indicate that Charles acted for his brother William, or had a right so to act, or assumed so to act, or that he undertook to sell and deliver the stock of William, and so, considering the evidence referred to and matters yet to be noticed, we construe the finding to be that as to the stock of Charles there was a meeting of minds and a contract between the testator and Charles, and that as to the stock of William the agreement mentioned was nothing more than an offer on the part of the testator very likely to be communicated to William. There could be no contract with William unless one was made with him or his agent. ''If a man goes through the form of making a contract with A through B as A's agent and B is not in fact the agent of A, there is no contract because there is only one party.'' Holmes' Com. Law, 308. At most the undertaking of the testator with regard to the stock of William was a ''nude communication without effect,'' 1 Plowden, Com. 5, a pollicitation merely, 1 Pothier, Obligations, 4. The stock appears to have had a speculative value at the time, though later it became of little value, and William may have preferred to hold his stock. The entry as to the stock of William showing what the father was ready to do on his part was one which he had a right to cancel and its erasure with the intention found by the trial court was an effectual cancellation. Of this more will be said herein.

There was however a completed contract between the testator and Charles by which the former took the stock of the latter and allowed the latter therefor $20,000, upon his advancement account. No erasure or other act of the father could affect this contract. The effect of this transaction was to

reduce the advancement account of Charles in the sum of $20,000. If a will designates payments or gifts to a child as advancements their re-payment after the date of the will at any time during the testator's life goes in reduction of the amount to come out of the child's portion on account of such advancements. *Leggett* v. *Davidson,* 131 Mich, 77, 90 N. W. 1060; *In re Musselman's Estate,* 5 Watts 9.

That the two blocks of stock did not stand alike was determined by the arbitration of Judge Hoyt H. Wheeler who, acting within the scope of matters duly submitted to him by all parties in interest, to be determined in accordance with the law, made and published a written decision to the effect that the executors had a right to treat the Charles P. Harris stock as belonging to the estate of his father, and that they had not the right so to treat the William A. Harris stock. Judge Wheeler's decision was accompanied by a well reasoned opinion in which he reviewed the transactions and evidence just referred to with, reference to the stock of Charles and of William and the making of the book entries and the erasures thereof; but confining the effect of the award of Judge Wheeler to the precise question submitted and decided, that is the ownership of the stock, and remembering that the award was before the trial court, we are confirmed in the conclusion that the findings of that court have been correctly construed.

It is beyond question that as to matters submitted, an award duly made and published as was that of Judge Wheeler, has the binding force of a judgment. *Morse* v. *Bishop,* 55 Vt. 231; *Soper* v. *Frank,* 47 Vt. 368; *Barker* v. *Belknap's Estate,* 39 Vt. 168; *Babcock* v. *School District,* 35 Vt. 250; *Woodrow* v. *O'Connor,* 28 Vt. 776; *Briggs* v. *Brewster,* 23 Vt. 100; *Rixford* v. *Nye,* 20 Vt. 132.

But there is another matter which was before the trial court which must determine the construction of the finding in question.

Sometime after the award of Judge Wheeler the final account of the executors under the will, who were Charles P. Harris and William A. Harris, was made up as of January 1, 1896, with a view of turning the estate over to the trustees and was filed in the probate court. In this account as made up and filed no credit was allowed Charles P. for the $20,000. Upon the hearing on the allowance of this account the probate court

ordered that the $20,000 be credited to the account of Charles P. Harris and that the 350 shares of stock, before referred to, be carried on the proper schedule as an asset of the estate.  In other respects the account as made up and filed was on hearing allowed.  This judgment of the probate court was appealed from by all the parties in interest except Charles P. and Susan.  On February 7, 1899, the county court affirmed the judgment of the probate court in pursuance of a stipulation signed by all the parties in interest except Susan.  The stipulation was entitled as of the cause and read as follows: ''In the above entitled cause it is stipulated and agreed that the judgment of the probate court, allowing the executors account, shall be affirmed without cost, and that such judgment shall be certified back to the probate court.''

Some three years of delay had been caused by the appeal and after the judgment of the county court was certified back to the probate court a further final account was made up by the executors in which the item of $20,000, was deducted from the assets of the estate and applied on the advancement account of Charles P. Harris in accordance with the previous judgment of the probate court and of the county court.  This account was allowed by the probate court September 6, 1899, and on the back of the judgment of allowance was indorsed the final assent of all the parties in interest including Susan whose assent was indorsed by Charles P. Harris as her attorney.  So far as the executors were concerned this was the final settlement of the estate the same having been since then in the hands of the trustees.

The fact that Susan did not sign the stipulation in the county court is immaterial.  She did not appeal from the judgment of the probate court and her contention here as shown by the exceptions and by the brief in her behalf in this Court is, with respect to the $20,000, the same as that of Charles P. Harris, namely, that it is not a part of the general assets of the estate, but that it was properly applied to reduce the advancement account of Charles P. and that the matter of its application is *res judicata*.

The question of the effect of a judgment or decree on the merits, rendered by consent, is therefore here raised.  In *Pelton v. Mott*, 11 Vt. 148, 34 Am. Dec. 678, the Court held that where a bill in chancery was dismissed upon its merits by consent of

parties the matter of the bill was thereby adjudicated. The Court say: "Though in point of fact the court may not have passed upon the matters of the bill, yet by the consent and agreement of the orator the decree of dismissal was entered upon the merits, and there can be no doubt that a judgment entered up by the court upon the agreement of parties is, to say the least, as conclusive upon them as if judgment were rendered in the ordinary course of proceeding."

In the *Vermont & Canada R. Co.* v. *Vermont Central R. Co.,* 50 Vt. 500, it was held that certain consent decrees and orders therein treated of did not have the force of decrees; and from much of the language used one might gather that it was the view of the court that consent decrees and judgments in general did not have the force of adjudications. The case in the 11th Vermont is not referred to, and the cases which are referred to upon the point in question will be considered.

The case of *Wadhams* v. *Gay,* 73 Ill. 417, is referred to. But this case, to use the language of the United States Supreme Court in reference thereto, "dealt merely with the right of a court of equity to refuse to lend its aid to enforce an incomplete and ineffective decree in partition proceedings." *Harding* v. *Harding,* 198 U. S. 317, 25 Sup. Ct. 679, 49 L. Ed. 1066. That the ineffective decree was a consent decree was an immaterial matter. The Supreme Court of California had refused to give full faith and credit to a consent judgment of the Illinois court on the ground that such a judgment did not have in the State of Illinois itself the force of an adjudication, and had referred to the case of *Wadhams* v. *Gay,* cited by our Court in the railroad case just referred to. This action of the California court raised a federal question which was taken to the United States Supreme Court. That Court held that the Supreme Court of California had misapprehended the law of Illinois and the scope of the Wadhams case, and pointed out that in Illinois "a consent decree has the same force and effect as a decree *in invitum.*" *Harding* v. *Harding,* 198 U. S. 317, 25 Sup. Ct. 678, 49 L. Ed. 1066, citing *Knobloch* v. *Mueller,* 123 Ill. 554, 17 N. E. 696, and *O'Connell* v. *Chicago Terminal R. R. Co.,* 184 Ill. 308, 56 N. E. 355. The Illinois cases cited show conclusively that the California court was wrong as to what the force of a consent decree is in the former state.

In the case last cited from the reports of our State reference is made to the case of *Jenkins* v. *Robertson,* L. R. 1 Sc. App. 117. But without an analysis of this case, in which the House of Lords had to apply the law of Scotland, it is enough to say that in England "a judgment by consent operates as an estoppel *inter partes* as much as if the case had been fought out. It makes no difference that the court has not exercised its mind on the matters in controversy." *South American & Mexican Co., In re Bank of England,* L. R. 1 Ch. 37 (1895). The case is fully considered. Justice Vaughan Williams who considered the case before it went to the Chancery Division on appeal gave as his reason for the time spent upon it that the case seemed so clear that he feared he must be overlooking something. In the Appeals Division the Lord Chancellor delivered his opinion, at some length, holding the views of Justice Williams to be correct in every particular. Those sitting with him gave concurring opinions, one of the Judges declaring that, in a legal sense, the question was not arguable.

In this case it was said of *Jenkins* v. *Robertson,* that it was no decision upon the general law, that it did not touch the matter at all. We have examined the Jenkins case, so much relied upon in 50 Vermont, and it appears to be this: Under the law of Scotland a private individual may make himself declarator for the purpose of asserting a public right of way. Some individuals did this by bringing a suit, but they compromised the suit and allowed judgment against them. Thereupon Jenkins came forward as declarator to vindicate the rights of the people, and the court held that the public rights had not been adjudicated by the judgment against the former volunteers rendered as the result of their individual assent. Obviously the decision was right, and it is equally obvious that it does not in any way detract from the force and effect of a judgment *inter partes* rendered by consent.

In the case in 50 Vermont, *Edgerton* v. *Muse,* 2 Hill, (S. C.) 51, is referred to. In that case there had been a consent decree for the partition of the property of an estate, and a petition was brought for the correction of a mistake in including in the provisions of the decree property which did not belong to the estate. Notwithstanding the use of some irrelevant language, the decision was to the effect that the petition was seasonably brought and might be entertained although the decree was a

consent decree and without doing violence to the general doctrine that in the case of consent decrees there is a waiver of error.

In the case in 50 Vermont, there is a reference on this matter of consent decrees to *Union Bank* v. *Marin,* 3 La. Ann., 34, mention being made of the fact that the civil law is the basis of the law of Louisiana. We are not aware that the doctrine of the civil law in respect to judgments by consent differs except in phraseology from that of the common law and are not disposed to distinguish the Union Bank case on that ground; for whatever construction the decision in that case should receive, the Law of Louisiana is that a consent judgment is a binding adjudication between the parties of the same effect as any other judgment. *Dunn* v. *Pipes,* 20 La. Ann., 276. See also *Calhoun* v. *Lane,* 39 La. Ann., 594, 2 So. 219, and *Antoine* v. *Smith,* 40 La. Ann., 560, 4 So. 321. In the Dunn case the early case of the Union Bank was not overlooked, but as the report shows was called to the attention of the court.

"A final judgment on the merits is just as conclusive if entered by consent as if rendered after a contest." 1 Van Fleet's Former Adjudication, sec. 33; 1 Freem. Judgm., sec. 330; 2 Black, Judgm. sec. 705; *Nashville etc. Ry.* v. *United States,* 113 U. S. 261, 5 Sup. Ct. 460, 28 L. Ed. 971; *Dunman* v. *Hartwell,* 9 Tex. 495, 60 Am. Dec. 176; *French* v. *Shotwell,* 5 Johns. Ch. 568; *Gifford* v. *Thorn,* 9 N. J. Eq. 702; *Healy* v. *Deering,* 231 Ill. 426, 83 N. E. 226, 121 Am. St. Rep. 331; *Kuteman* v. *Carroll,* 105 S. W. 222; *Mains* v. *Des Moines Nat. Bank,* 85 N. W. 758, 113 Iowa, 395; *Casler* v. *Chase,* 60 S. W. 1040, 160 Mo. 418; *Steiner* v. *Lenz,* 81 N. W. 190, 110 Iowa, 49; *Adler* v. *Van Kirk Co.,* 114 Ala. 551, 21 So. 490, 62 Am. St. Rep. 133; 2 Daniell, Ch. Pl. & Pr., 973, 974; Seton on Decrees, Heard's Ed. 774, 775.

That the constitutional full faith and credit is given by the courts of one state to the judgments of the courts of another state when they are accorded the faith and credit which they receive in the state in which they are rendered is beyond all controversy. *Cole* v. *Cunningham,* 133 U. S. 107, 10 Sup. Ct. 269, 33 L. Ed. 538; *Board of Public Works* v. *Columbia College,* 7 Wall. 521, 21 L. Ed. 687; *Suydam* v. *Barber,* 18 N. Y. 468, 75 Am. Dec. 254; *Engel* v. *Scheuerman,* 40 Ga. 206, 2 Am. Rep. 573.

Judgments and decrees by stipulation are now entered as a matter of common practice in cases of the very highest importance with the understanding of parties that such judgments, when the court has jurisdiction of the matters covered by the stipulation, render such matters *res judicata,* and that such judgments are entitled to the faith and credit of judgments in general in every state of the Union. It is doubted that at this day any court of this country would hold that the mere fact that a judgment or decree is entered upon a stipulation detracts anything from its force as a domestic adjudication or disentitles it to full faith and credit as such in the courts of the other states. Certainly this Court does not so hold but holds the direct opposite of that proposition. In the railroad case, 50 Vt. 500, which has made necessary the discussion on this point the Court held that the consent decrees and orders which there were under review were "beyond the judicial function of the court"; and so, without considering the grounds of such holding, it is clear that what was said in that case in diminution of the force and effect of consent decrees and judgments, said in connection with references to ill considered dicta and to anomalous, distinguishable or discredited cases, was unnecessary to the decision of the case. The law of this State with respect to consent judgments and decrees is as it was declared to be in *Pelton* v. *Mott,* 11 Vt. 148, 34 Am. Dec. 678, and is in accord with the law of England and with that of the best considered decisions of the courts of last resort in this country as has been herein indicated.

It is in effect urged on behalf of the children, other than Charles P. and Susan, that the judgments in the settlement of the final account of the executors and the stipulation in the one case and the indorsed assent in the other conclude nothing on the ground that, notwithstanding such stipulation and assent and the judgments in accordance therewith, the matters covered thereby would still be open to determination upon the distribution of the estate at the termination of the trust, that is, when the widow reached the age of 75 years. But this contention is unsound. The decree settling the account of the executors was a final one. *Scoville* v. *Brock,* 75 Vt. 243, 54 Atl. 177; *Probate Court* v. *Vanduzer,* 13 Vt. 135; *Rix* v. *Heirs of Smith,* 8 Vt. 365; *Probate Court* v. *Merriam,* 8 Vt. 234.

The trustees were the first takers of the estate left after the payment of debts and the distribution by which they took

was a final distribution so far as the executors were concerned. The fact that in a future year the trust estate was to be distributed did not have the effect to postpone the final settlement and distribution which the executors were to make. If the final settlement of the executors' account could be postponed 9 years by reason of a gift in trust then it might be postponed 25 years or an indefinite time. In any view which it is possible to take of the case the settlement of the executors' account and the turning over of the residue of the estate to the trustees was in respect to the executors a final settlement and distribution.

Both the executors and the trustees made from time to time advance payments in the nature of loans to some of the children. On such advance payments the probate court in settling the account of the trustees charged simple interest at six per cent from the time of the respective payments. There is nothing on either brief presented to this Court which challenges the correctness of the course of the probate court in this respect but the matter was somewhat discussed in oral argument. These payments were in the nature of a partial distribution and so it was for the court on final distribution to see that these advance payments did not work inequality. *Walworth's Est.* v. *Bartholomew's Est.,* 76 Vt. 1, 56 Atl. 101.

A child who drew out, let us say $1000, in 1900, got more than a child who drew out $1000, in 1904, for in the meantime the $1000 first drawn out might have been on interest. The equalization required by the law and by the provisions of the will required the computation of interest on these advance payments by executors and trustees, and since the case is barren of anything to show that the rate of interest should have been other than six per cent, it was proper for the court to compute interest at the legal rate. Other questions of interest must have entered into the final distribution ordered and decreed by the probate court, but it does not appear that they were not properly dealt with.

December 8, 1906, the probate court rendered its final decree distributing the trust estate as of October 19, 1906. It decreed to each of the children, other than William A., a sum sufficient to make each of them equal with the said William A., that is, to Charles P. Harris, $45,370.23; to Martha V. Newell, $11,145.39; to the estate of Harriet L. Harris, $33,916.64; to

Nellie S. Bowles, $11,730.29; to Mary G. Harris Sweeney, $24,230.80; to Susan Mather Waterman, $38,123.04.

At the time of the order of distribution, the daughter Mary G. Harris bore the name of Sweeney, and Susan Mather bore the name of Waterman in consequence of their respective marriages subsequent to the time when they were named in the will. The probate court further ordered and decreed that all the residue of the estate, except the $50,000, referred to in this opinion at the outset, and the home place, furniture and other personal property connected therewith, as to which there was a special provision in the will, be divided equally among Charles P. Harris, Martha V. Newell, William A. Harris, the estate of Harriet L. Harris, Nellie S. Bowles, Mary G. Harris Sweeney and Susan Mather Waterman. Some details in respect to the partition were provided for by the order and decree, but these need not be mentioned as no question is made about them and as they appear in full of record. In the county court it was discovered that there was an error in the computation of the amount to be paid to Susan Mather Waterman before the distribution of the residue, a mistake about which counsel are agreed, and it was adjudged that the sum to be paid to her, to put her on equality with William A. Harris as of the time to which decree of the probate court related should be $39,123.04, instead of $38,123.04. In all other respects the county court affirmed the decree of the probate court.

All claims that the action of the county court was incorrect, whether made in the briefs of counsel or in oral argument, have been considered with the result that the

*Judgment of the county court is affirmed. Let the case be certified to the probate court.*